TRAYLOR, Justice,
dissenting.
hi respectfully dissent from the majority’s determination that any portion of the respondent’s discipline should be suspended, as I believe that a greater discipline should be imposed. In addition, I most strenuously disagree with the statement contained in the concurrence and dissent that the offensive, lewd and inappropriate sexual comments which form part of the basis of Count 1 of Formal Charge 99-DB-107 could ever be dismissed as “banter.”
This belief is based on a review of the disciplinary record with regard to Count I of Formal Charge 99-DB-107. This count details the respondent’s conduct as a judicial candidate during which time he allegedly made lewd and inappropriate comments to female members of the hotel staff of a Mississippi hotel. The respondent initiated this contact while assisting in planning a day trip that was to take place during a continuing legal education program for the Jefferson Parish Bar Association. The deposition testimony contained in the record shows that, in addition to identifying himself to the hotel’s staff as “Judge Gaudet” or “soon-to-be-Judge Gau-det,” the respondent made crude sexual comments to two of the women with whom he spoke telephonically.
The first instance occurred when the respondent spoke with Linda Spruill, a hotel sales manager for the Beau Rivage casino and hotel. After ascertaining that the respondent was calling in connection with the Jefferson Bar Association’s upcoming ^meeting, Ms. Spruill told the respondent that he needed to speak with Andrea Touart.[1] Ms. Spruill remembered the respondent replying, “He said, like twat, and I said, No, like Touart. And he said, well, with a name like that, she must be a very busy girl, or something along that line.”[2] When subsequently asked if she became upset with the caller, Ms. Spruill responded in the affirmative.
ODC counsel: Did you get upset with him?
Ms. Spruill: Oh, yeah. I mean, it was— there was no reason for that comment to be made. I speak very clearly, I believe, and I don’t think he would have misunderstood me pronouncing this young lady’s name.
ODC counsel: Is there any way you think you might have made a mistake about what he said?
Ms. Spruill: No, huh-uh (indicating no.)
ODC counsel: It’s pretty clear to you?
Ms. Spruill: Yeah, it’s pretty clear. I mean, that’s not a word that I often *487 hear, so, you know, you kind of go, Huh?[3]
The record shows that the phone conversation with the respondent was not the end of offensive comments which Ms. Spruill had to suffer from the respondent. In questioning Ms. Spruill at her deposition, the respondent, who represented himself, made her pronounce her co-worker’s name over and over again,[4] and. argued with her as to what she was saying. In addition, he told her that she did not understand the meaning of the offensive word in question.[5] Finally, posturing as if he believed her 13understanding of the term reflected some sort of regional differ-
ence, the respondent forced Ms. Spruill to relate every place she had lived from birth.[6]
ODC counsel then elicited this testimony upon further examination:
ODC counsel: Just a little the bit of redirect here. The word spelled T-w-a-t, that’s what you thought you heard the gentleman say on the telephone?
Ms. Spruill: That’s what he did say on the telephone.
ODC counsel: Okay. And did he follow that up with any other jokes or colloquialisms?
Ms. Spruill: Yes, the thing about, well, with a last name like that, she must be *488 a busy girl, or something along that line. I do not actually remember the actual phraseology. But it was enough that I hung up the phone going, Oh, my gosh, I can’t believe this man just said this and he said he was a judge. (Emphasis added)[7]
The second instance occurred when the respondent spoke with Ann Hoff, the director of hotel marketing at the Beau Ri-vage casino and hotel. Ms. Hoff related her conversation with the respondent as follows:
ODC counsel: Do you remember the substance of the conversation?
Ms. Hoff: I do. I do. I remember it because it was a little unusual. There was a some specific requests. He said that he was attending the conference. He was trying to get a hold of [the hotel sales manager in charge of the Jefferson Parish Bar Association function], I believe that’s what he had said, and hadn’t had luck contacting him; and that he had always attended this conference and wanted to know what we were going to do for him specifically. And I said I really need for you to be more specific. What are you looking for? And he said, well, I want — usually I have something special. And I said again, I need you to be more specific on what you’re looking for, which we never really got to the bottom of, but I think that he was looking for an upgrade to a suite. He did reference that he was very important, that he was a judge. And I told him that I would need to get back with him, and he referenced — he was making some small talk with me, and he referenced that I sounded like a nice gal, and that if my husband wasn’t taking care of me, he would.
Gaudet: What’s that?
ODC counsel: You’ll have your opportunity to ask her questions, sir.
ODC counsel: Was that the end of the conversation?
[sMs. Hoff: I don’t recall, but I believe that was pretty much the end of the conversation because when he said that, I felt like, okay, this conversation is done.
ODC counsel: Did you hang up the phone on him or anything like that?
Ms. Hoff: Oh, no, no, no. I mean, we’re not in the business of doing that. We deal with lots of unique situations in the sales department every day. That one, I must say, was most unique, which is why I remember it. But, no, it wasn’t a harsh or abrupt end to the conversation.[8]
As with Ms. Spruill, the respondent took his opportunity of cross-examining Ms. Hoff at her deposition as another opportunity for harassment. He argued with her regarding the purpose of his phone call until she responded as follows:[9]
Ms. Hoff: Mr. Gaudet — Mr. Gaudet, there are very few people that I’ve spoken to on a professional level that have ever referenced my being married or implying that my husband is not taking care of me.
Gaudet: Including myself.
Ms. Hoff: I remember that specifically. Gaudet: You created that specifically.
Ms. Hoff: I am perfectly willing to say that the details of pottery[10] I don’t *489 recall because, you’re right, I get lots of requests. However, we did not discuss transportation. We did not.
Gaudet: You did not hear it, you mean?
Ms. Hoff: But I did hear your other comments, no question. No question. And that’s why I remember it so clearly.[11]
Even reviewing a cold deposition record, it is obvious that the respondent was | r,argumentative, insulting, inappropriate and rude to Ms. Hoff, the deponent. His demeanor was far from professional after eliciting the information from Ms. Hoff that she called the contact person from the Jefferson Parish Bar Association to complain about his actions:
Gaudet: Did you suggest anything to the person you spoke to at the bar association about what you might want to try to be done as a result of what you heard or described?
Ms. Hoff: No. I just told them that we had a situation with an attendee from their group who was difficult and who was giving some members of my staff a difficult time and embarrassing them and that it was inappropriate and they agreed.
Gaudet: And this embarrassing and all this sort of stuff is coming from hearsay. You didn’t hear any of that, did you? Your staff or whatever would have told you something that you passed on?
Ms. Hoff: Oh, they told me. They told me.
Gaudet: They testified here today.
Ms. Hoff: Uh-huh (indicating yes). And it was — it all revolved around — the call revolved primarily Andrea Touart.
Gaudet: Wrong, but that’s okay. You’ve made it revolve around that.... [12]
The respondent informed Ms. Hoff during the deposition that he did not, in fact, attend the bar conference.
Gaudet: So when you said I was an attendee, you assumed that I would be an attendee; is that right?
Ms. Hoff: That’s correct.
Gaudet: Is it possible you could have assumed a whole bunch of other things?
Ms. Hoff: Oh, I doubt. I certainly didn’t assume what you said to me about my husband.
17Gaudet: Well, ma’am, I don’t say anything to people about husbands. But in any event, that’s all I have.
Ms. Hoff: I’m not assuming what you said about being a judge either.
Gaudet: You didn’t assume that I was a judge?
Ms. Hoff: No.
Gaudet: Then that meant nothing to you, correct?
Ms. Hoff: Frankly, what your status is meant nothing to me then; it means nothing to me now.
Gaudet: So does yours mean to me. That’s all I have, ma’am.[13]
The record shows that the respondent in one instance made a lewd play on a crude word normally used as a derogatory term for a part of a woman’s anatomy.[14] The *490 respondent’s protestations that he meant a less known use of the term to mean “buttocks” is disingenuous, at best. In correspondence during the early investigation of this matter, the respondent stated he thought Ms. Spruill had said the last name as “Trueart” and that he “did not have any true art.”[15] This dovetails with earlier reports that the respondent had said, in explaining his joke to Ms. Spruill, that “he didn’t have one.”[16] Thus, his protestations that he said the words “true art” or meant the lesser known definition of the offensive word do not ring true.
In another, separate instance, the respondent intimated to a woman that “if [her] husband wasn’t taking care of [her], he would.” This is a patently offensive remark. As the father of three daughters, I cannot fathom how these offensive comments could ever be dismissed as “banter.”
The respondent made these comments while he was a judicial candidate and ^either intimated he was, or was about to be, a judge. The crude comments alone would be bad enough, but coming from a bar member running for judicial office, the comments reflect poorly on all members of the bar and judiciary. Lawyers running for judicial office are held to the same standard as judges. “As a public official, a judge’s behavior both on and off the bench must comply with the highest of standards delineated in the Canons.” In re: Ellen-der, 2004-2123 p. 9 (La.12/13/04), 889 So.2d 225, 231. “Judges are held to a higher standard by virtue of their position and authority they have over citizens and must avoid any action which would cause the citizens to question their integrity or the integrity of the bench.” Id.
This court properly finds that the respondent violated Canons 7 B(l)(a) and 7 G of the Code of Judicial Conduct in connection with this conduct. However, I believe that no portion of the respondent’s suspension from the practice of law should be deferred. Moreover, I believe that a harsher period of suspension is in order.

. The record indicates that Ms. Touart's last name is pronounced "Towah.” Exhibit ODC-3, p. 10.

. Exhibit ODC-3, p. 7.

. Exhibit ODC-3, p. 8-9.

. Exhibit ODC-3, p. 9-11.

. The deposition transcript reveals the following:
Gaudet: You just pronounced the name Andrea Touart, and you put a T on the end of it.
Ms. Spruill: I did not. I said Touart.
Gaudet: Well, then maybe it’s your tongue clicking, but there was a T at the end of it. You said "Twat.”
Ms. Spruill: I don't believe so.
Gaudet: Should have had my recorder on at the time, but go ahead....
[[Image here]]
Gaudet: Well, what did you think you heard her name pronounced as?
Ms. Spruill: Twat, T-w-a-t, or how ever you want to spell it.
Gaudet: Okay. What is—
Ms. Spruill: That’s exactly what was said back to me.
Gaudet: What is offensive about T-w-a-t, or something like that?
Ms. Spruill: It's a slang name for the feminine body. I mean, it’s — it's very offensive.
Gaudet: It’s a slang name?
Ms. Spruill: Uh-huh (indicating yes), for a—
Gaudet: Feminine body?
Ms. Spruill: Yes, uh-huh?
Gaudet: What part of the body are you referring to, ma'am?
Ms. Spruill: Well, the female genitalia. I've heard it referred to as that on bathroom walls.
Gaudet: Genitalia?
Ms. Spruill: Uh-huh (indicating yes).
Gaudet: Are you talking about sexual genitalia?
Ms. Spruill: Yes, sir. Yes, sir.
Gaudet: Ma'am, what area are you speaking of?
ODC Counsel: I think—
Gaudet: If you’re not referring to — listen to me. Let me make this clear. If you’re not referring to the derriere or gluteus maximus, the behind, so to speak—
Ms. Spruill: Right.
Gaudet: Is that what you're referring to?
Ms. Spruill: No, sir.
Gaudet: That’s not your understanding of what the word T-w-a-t pronounced "twat” means, right?
Ms. Spruill: No, its not.
Gaudet: You think it means either breast or — I'm not—
Ms. Spruill: It's the other. It's the other.
Gaudet: The other?
Ms. Spruill: Uh-huh (indicating yes).
Gaudet: All right, ma’am. So you don’t really understand the use of the word "twat.” For your information, in the connotations that I’ve heard it many times, it refers [to] your rear end.
Ms. Spruill: Well, I—
Gaudet: Are you from Louisiana?

.Exhibit ODC-3, p. 13-15.

. Exhibit ODC-3, p. 16.

. Exhibit ODC-4, p. 6-7.

. See also Exhibit ODC-4, p. 11-12.

. In earlier questioning, the respondent asked Ms. Hoff if she remembered that he was trying to set up a day trip to a pottery shop in the area. Upon her memory being refreshed as to that point, Ms. Hoff did recall *489 that part of the conversation. Exhibit ODC-4, p. 11.

. Exhibit ODC-4, p. 14.

. Exhibit ODC-4, p. 22-23.

. Exhibit ODC-4, p. 24.

. "Twat” — l:Vulva—usu. considered vulgar. Webster's Third New International Dictionary (1976).

. Exhibit ODC-6, p. 2.

. Exhibit ODC-5.